DAVID J. DEERSON, CA Bar No. 322947
Email: ddeerson@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

AUSTIN W. WAISANEN, WY Bar No. 8-7023*
Email: awaisanen@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (307) 213-0511
Facsimile: (917) 419-7747
*pro hac vice pending

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| WESLEY YU,<br><br>        Plaintiff,<br><br>  v.<br><br>CITY OF EAST PALO ALTO,<br><br>        Defendant. | No. 3:25-cv-06456<br><br>**COMPLAINT** |

Complaint
No. 3:25-cv-06456         1

# INTRODUCTION

1. Wesley Yu lives in his home at 1257 Laurel Avenue in East Palo Alto, California with his wife and the couple's three-year-old daughter. The growing family is quickly outgrowing their less-than-1,000 sq. ft. home, and they need more room for their child to play and for frequent visits by their in-laws. To that end, Wesley split his lot under SB 9 (*see* Cal. Gov't Code § 66411.7) and applied for a permit to construct two new residential units—a single family home with an accessory dwelling unit (ADU)—on the new lot. The lot split was approved without incident.

2. But when it came time to apply to create the new residences, the City of East Palo Alto (City) hit the Yu family with a major problem. It refuses to issue a permit until the Yu family assents to one of two injurious conditions: pay nearly $55,000 in "inclusionary housing" fees, or maintain the new residence as an "affordable unit" in perpetuity to be rented to a stranger.

3. The City's Inclusionary Housing Ordinance (the Ordinance) seeks to do the impossible: it tries to make housing more affordable by making it more costly. More fundamentally, by imposing permit fees that have nothing to do with the actual impacts of Wesley's development, the Ordinance is unlawful. The City cannot use its land-use permitting authority to take money or property from permit applicants in order to address problems that those applicants do not create. Under U.S. Supreme Court precedents in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), *Koontz v. St. Johns River Water Management District*, 570 U.S. 595 (2013), and *Sheetz v. County of El Dorado*, 601 U.S. 267 (2024), East Palo Alto cannot force land-use permit applicants to give up money or other property as a condition of granting a permit unless the money or property demanded is designed to mitigate some public problem that the applied-for development would create.

4. This Complaint challenges East Palo Alto's Inclusionary Housing Ordinance, East Palo Alto Muni. Code (EPAMC) Ch. 18.37. Wesley Yu seeks a

declaration that the requirements of the Ordinance are unconstitutional conditions both facially and as applied. He further seeks an injunction prohibiting the City from imposing exactions under the Ordinance as a condition of his development permits, and an award of attorney fees and costs incurred in this action. Accordingly, Mr. Yu alleges as follows:

## JURISDICTION

5. This suit is filed pursuant to 42 U.S.C. § 1331 (federal questions) as it arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(4) (civil rights) as it seeks redress of civil rights violations under 42 U.S.C. § 1983.

6. This suit also seeks a declaration of rights under the Declaratory Judgment Act, 28 U.S.C. § 2201.

## VENUE

7. The property that is the subject of this action is located—and the civil rights violations alleged herein took place—in East Palo Alto, California. Therefore, venue is proper in this judicial district.

## PARTIES

8. Plaintiff Wesley Yu is an individual citizen of the United States. He is domiciled and resides in East Palo Alto, California, where he lives with his wife and daughter. As the owner of real property in East Palo Alto seeking to build a home, he is subject to the Ordinance.

9. Defendant City of East Palo Alto is a political subdivision of the State of California, the local governing authority in East Palo Alto, and the party who promulgates and enforces the unconstitutional policies, customs, and practices alleged herein.

## LEGAL BACKGROUND

**The Takings Clause and Land Use Permit Exactions**

10. Under the Takings Clause of the Fifth Amendment to the United States

1  Constitution, no government agency may take private property for a public use
2  without paying just compensation. U.S. Const. amends. V (Takings Clause), XIV
3  (applying Takings Clause to state and local governments). As a corollary to this rule,
4  a government agency imposing a land-use permit condition that requires the
5  dedication of private property, including money, "must make some sort of
6  individualized determination that the required dedication is related both in nature
7  and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391; *see*
8  *Koontz*, 570 U.S. at 595 (holding that monetary exactions are subject to the same
9  requirement). Specifically, the agency must carry the burden of showing that the
10 exaction bears an "essential nexus" and "rough proportionality" to the public impacts
11 of the proposed project, lest the exaction be nothing more than an "out-and-out plan
12 of extortion." *Nollan*, 483 U.S. at 837; *Dolan*, 512 U.S. at 387.

**The Inclusionary Housing Ordinance**

14  11.   The Inclusionary Housing Ordinance[1] sets out a program of development fees and other exactions imposed on new housing. A true and correct copy of the Ordinance, as codified at Chapter 18.37 of the EPAMC, is attached as **Exhibit A**.

17  12.   According to its statement of legislative purpose, the Ordinance is designed "to enhance the public welfare by establishing policies which require the development of housing affordable" to low and moderate income households, "help meet the City's regional share of housing needs, and implement the goals and objectives of the general plan and housing element." EPAMC § 18.37.010(A).

22  13.   The Ordinance also states a purpose of "assist[ing] in alleviating the use of available residential land solely for the benefit of households that are able to afford market rate housing" and "alleviating the impacts of the service needs of households in new market-rate residential development[.]" *Id.* § 18.37.010(B).

26  14.   The Ordinance applies, with limited exception, to all "residential

---

[1] The Ordinance is codified at Chapter 18 of the EPAMC, which is available online at https://library.municode.com/ca/east_palo_alto/codes/code_of_ordinances.

Complaint
No. 3:25-cv-06456              4

development," which includes any development requiring a permit that creates one or more dwelling units. *Id.* §§ 18.37.030(A), .020(Z).

15.  For developments creating five or more dwelling units, 20% of dwelling units must be provided as "inclusionary units," with price controls based on area median income and shifting depending on whether the developments are classified as "ownership" or "rental" development. *Id.* § 18.37.050(A).

16.  Under the Ordinance, the difference between an "ownership" and a "rental" development is whether the units may legally be sold separately. Thus, an "ownership" development is "any residential development that includes the creation of one or more additional dwelling units that may be sold individually," while a "rental" development is one that creates units "that cannot be lawfully sold individually in conformance with the Subdivision Map Act." *Id.* § 18.37.020(W), (Y).

17.  For projects that propose fewer than five units, permit applicants are given the "option [] either to provide one inclusionary unit or pay a fee to the City[.]" *Id.* § 18.37.050(B).

18.  Such fees are deposited into the City's "Housing Fund," which is to be "expended exclusively to provide rental housing affordable to low income households (or below), ownership housing affordable to moderate-income households (or below), and any special needs populations in the City, . . . and for administration and compliance monitoring of the inclusionary housing program." *Id.* § 18.37.110(B).

19.  Inclusionary units are subject to various standards ensuring that features like construction appearance and quality, number of bedrooms, unit size, location, and amenities are comparable to those of the market-rate (*i.e.*, non-inclusionary) units within the same development. *Id.* § 18.37.060.

20.  Various alternative compliance methods are available contingent on approval in each case by the City Council. *Id.* § 18.37.080(A). These include the construction of off-site inclusionary units and a catch-all provision for "other alternative compliance methods" which a "developer may propose" and which may be

approved only on a finding that the method will produce "as many or more inclusionary units at the same or lower income levels or will otherwise provide greater public benefit than would provision of the inclusionary units on-site." *Id.* § 18.37.080(C), (D).

21. The Ordinance requires all residential developments to provide an "inclusionary housing plan describing how the development will comply with" the Ordinance, as well as requiring permit applicants to "enter into an inclusionary housing agreement" to be recorded against the property. *Id.* § 18.37.090(A), (B). Among other things, the agreement shall specify "provisions for income certification and screening of potential purchasers or renters of units, and resale control mechanisms, including the financing of ongoing administrative and monitoring costs, consistent with . . . any adopted inclusionary housing guidelines[.]". *Id.*

22. Under the Ordinance, "[a]ll inclusionary units shall remain affordable to the targeted income group in perpetuity." *Id.* § 18.37.100(A).

23. No household may occupy an inclusionary unit until the household's eligibility has been determined by the Community and Economic Development Director, and any household occupying an inclusionary unit must occupy it as the household's principal residence, with limited exception for temporary hardship. *Id.* § 18.37.100(C), (D).

24. The Ordinance provides for waiver, adjustment, or reduction of inclusionary housing requirements "based upon a showing that" the Ordinance would have an "unconstitutional result." *Id.* § 18.37.120(A). The applicant bears "the burden of presenting substantial evidence to support the claim" underlying a waiver request. *Id.* § 18.37.120(D).

25. Various guidance documents available from the City's website fill out the regulatory atmosphere.[2]

---

[2] Many, if not all, of these documents can be found under "Supporting Documents" at

26. Of particular relevance here, Chapter 4 of the Inclusionary Housing Guidelines sets out rules for rental inclusionary units. A true and correct copy of Chapter 4 is attached as **Exhibit B.**

27. It provides that rental inclusionary units "shall not be operated at less than 90% occupancy for more than six consecutive months[.]" City of East Palo Alto Inclusionary Housing Guidelines, Ch. 4, Section 9.

28. It also provides that the developer of the unit "is responsible for marketing the rental Inclusionary Units," including a requirement to "post each vacant rental Inclusionary Unit" on a specified county-wide listing service. *Id.*

## FACTUAL ALLEGATIONS

### The Yu Family Project Obtains Initial Approval

29. In 2024, Wesley Yu began the project of splitting his existing lot and adding a new single-family residential structure with an ADU. In the short term, Mr. Yu does not plan to rent or sell the new units; instead, he hopes to keep the units for the Yus' own occupancy to provide more space for their growing family, which is quickly outgrowing its less-than-1,000 square foot home, and to accommodate frequent visits from in-laws. In the long-term, the units would add new housing stock in the City and could be rented or sold depending on the Yus' needs.

30. Utilizing SB9, Mr. Yu split his lot into two with relative ease. The City approved of his plans for the lot split, and even approved an initial plan for the new units, in late 2024.

### The City Reverses Course and Imposes Inclusionary Housing Requirements

31. In April 2025, however, the City realized it should not have given plan approval for the new units because Mr. Yu had not submitted an Inclusionary Housing Plan. Yajaira Morales, Housing Project Manager for the City, wrote in an email to Mr.

---

the bottom of the City's "Inclusionary Housing" webpage, available online at https://www.cityofepa.org/housing/page/inclusionary-housing.

Complaint
No. 3:25-cv-06456                               7

Yu that "the building review cannot proceed until" Inclusionary Housing Plan requirements were completed. A true and correct copy of this email and those described in paragraphs 32–34 is attached as **Exhibit C.**

32. In response, Mr. Yu inquired whether he could "request alternative compliance and/or city council review" of the inclusionary housing requirements, noting that "$55k is a lot of money for the in lieu fee and my family is struggling to pay bills because of lost jobs / income with industry collapse." Mr. Yu also noted that his family's development project would "help[] the city build much needed housing units, and the in lieu fee would actually DECREASE affordability of housing."

33. Vice Mayor Mark Dinan, who was copied on the email thread, represented that the City was looking into making changes to the Ordinance and that he would "support waiving the fee" for Mr. Yu's project. Mr. Dinan also opined that the Ordinance imposes a "regressive tax which makes housing more expensive, and the logic behind it is deeply flawed," and expressed "hope" that the City "can find a way to move this project forward and not block it with arbitrary and high fees."

34. Ms. Morales responded that "[u]nfortunately, [the Ordinance] does not provide for alternative compliance or exemption based on financial hardship." She indicated that certain alternative compliance options may be available but would "require review and approval by the City Council," and concluded that "the in-lieu fee must be paid before the building permit can be issued."

35. On May 1, 2025, Mr. Yu met with Ms. Morales and Director of Community Development, Amy Chen, to discuss requirements under the Ordinance.

36. Following the meeting, Ms. Morales reached out to Mr. Yu by email and again confirmed that the "project **will not be eligible** to receive **a building permit** until it has completed the necessary steps with the Housing Team. This includes submissions and approval of the required Inclusionary Housing Plan." A true and correct copy of this email is attached as **Exhibit C.**

///

Complaint
No. 3:25-cv-06456                              8

## Wesley's Choice

37. Based on the text of the Ordinance and official guidance documents, as well as conversations with City Officials, Mr. Yu cannot proceed with his housing development project unless he either (1) pays an in-lieu fee of $54,891, or (2) sets aside one of the two new units as an inclusionary unit to be offered to unwanted tenants at below-market rates in perpetuity.

38. Both units constitute "rental" development under the Ordinance, as an ADU cannot legally be sold separately from a primary residence with very limited exception not relevant here. Cal. Gov't Code § 66341.

39. Given the family's assets, Mr. Yu likely would not qualify for occupancy in an inclusionary unit.

40. Thus, if Mr. Yu chooses the inclusionary unit option, he would be prohibited from occupying the unit.

41. Even if Mr. Yu did qualify for occupancy in an inclusionary unit, he would be forced to occupy it as his principal residence and to abandon his principal residence in his existing home.

42. At the same time, he would be prohibited from keeping the unit empty for more than six consecutive months.

43. In other words, the inclusionary unit option would force Mr. Yu to rent one of his units to an unwanted tenant rather than keeping it for his own family's occupancy.

44. But because of the family's limited income, the in-lieu fee represents a significant financial injury and casts the project's feasibility in serious doubt.

45. Of course, Mr. Yu does have a third option, which is not to build at all. Yet the City may not constitutionally force a person to choose between a building permit and the Fifth Amendment right to just compensation for property taken.

46. The City's definitive and final position that it will not grant Mr. Yu's application unless he complies with the challenged conditions inflicts an actual,

concrete, and irreparable injury.

47. Legal remedies, such as monetary damages, alone cannot restore Mr. Yu's constitutional right to be free from the challenged conditions.

## CLAIMS FOR RELIEF

## Unconstitutional Exaction

## 42 U.S.C. § 1983, 28 U.S.C. § 2201

48. All preceding allegations of this Complaint are incorporated by reference in this section as though fully set forth herein.

49. The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides that a person "shall be liable to the party injured" when, acting under the authority of a statute or ordinance, he or she deprives an individual of a right secured by the U.S. Constitution.

50. The City is a person within the meaning of that term in 42 U.S.C. § 1983.

51. The City acted under color of the Inclusionary Housing Ordinance when it conditioned permit approval for Mr. Yu's development project on a requirement that Mr. Yu either set aside one of the units as an inclusionary unit, or else pay an in-lieu fee.

52. The City has an established policy or custom of applying the Ordinance to exact property interests for the purpose of promoting affordable housing from permit applicants seeking to create housing units.

53. Mr. Yu is a citizen of the United States or a person within the jurisdiction thereof within the meaning of those terms in 42 U.S.C. § 1983.

54. Mr. Yu possesses rights, privileges, and immunities secured by the Constitution and laws of the United States, including, but not limited to:

  a. The right, privilege, or immunity to build on his own property, even if subject to the City's legitimate permitting requirements. *Nollan*, 483 U.S. at 834 n.3.

  b. The right, privilege, or immunity not to have its private property taken by the City for public use without just compensation. U.S. Const. amends. V, XIV.

c.  The right, privilege, or immunity to be free of deprivations of his property by the City without due process of law. U.S. Const. amend. XIV.

d.  The right, privilege, or immunity not to be forced by the City to forgo one constitutional right in order to enjoy another, or to choose between which constitutional rights it wishes to exercise.

e.  The right, privilege, or immunity not to comply with the Ordinance unless and until the City makes some sort of individualized determination that the required dedication is related both in nature and extent to the impact of Mr. Yu's proposed development. *Dolan*, 512 U.S. at 391.

55. The doctrine of unconstitutional conditions, as set out by *Nollan*, *Dolan*, *Koontz*, and *Sheetz*, is a federal doctrine designed to enforce the primacy of the Fifth and Fourteenth Amendments to the U.S. Constitution against state and local governments in the land-use permitting context. As such, a violation of the doctrine of unconstitutional conditions is actionable under 42 U.S.C. § 1983.

56. The City imposed unconstitutional conditions on Mr. Yu's development project, and it routinely imposes unconstitutional conditions on residential development by others under the Ordinance.

57. The Ordinance's in-lieu fee option demands property in the form of money linked to a specific, identifiable property interest—*i.e.*, the specific parcel(s) of real property for which development permits are sought.

58. The Ordinance's inclusionary unit option demands property in the form of dedications of several protected property interests, including (1) a financial interest in the affected unit; (2) the right of free alienation; (3) the right to exclude; (4) the right to sell or rent property at a fair market price; and (5) a servitude in the form of a perpetual deed restriction or restricted covenant.

59. Under the Doctrine of Unconstitutional Conditions, the government may demand property or money as a condition of approving a land use permit only if:

    a. The demanded property is needed to directly mitigate a public impact that would be directly caused by the development (the "essential nexus" test); and

    b. The amount of property demanded is roughly proportionate in magnitude to the public impact of the development (the "rough proportionality" test).

60. Both the essential nexus test and the rough proportionality test require heightened constitutional scrutiny.

61. To meet its burden under these tests, the government must make "some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Dolan*, 512 U.S. at 391.

62. The Ordinance fails these constitutional standards, both facially and as applied, because new residential development:

    a. Neither creates nor contributes to the need for affordable housing;

    b. Does not cause anybody else to be unable to afford housing; and

    c. Alleviates the need for affordable housing by creating new housing.

63. Because new residential development categorically does not have a negative public impact on housing affordability, there is no set of circumstances in which the Ordinance could satisfy *Nollan* and *Dolan*.

64. Beyond the in-lieu fee and inclusionary unit options, Mr. Yu did not have, and the City did not provide, any other lawful alternative to satisfy the Ordinance.

65. Mr. Yu suffered a cognizable constitutional injury the moment the City demanded that he accede to the unconstitutional demands as a condition on the issuance of his development permits.

66. Mr. Yu is entitled to equitable relief as allowed by 42 U.S.C. § 1983, and he is additionally entitled to declaratory relief under 28 U.S.C. § 2201.

## **RELIEF SOUGHT**

WHEREFORE, Plaintiff respectfully requests that this Court Grant the following relief:

A. A declaratory judgment that the Inclusionary Housing Ordinance imposes unconstitutional conditions both facially and as applied to Mr. Yu; and that Mr. Yu suffered a violation of his civil rights when the City conditioned approval of his projects on his forfeiture of the right to just compensation for property taken;

B. Equitable relief in the form of an injunction prohibiting the City and its officers, agents, servants, and employees from enforcing the Inclusionary Housing Ordinance against Mr. Yu, and an Order directing the City to issue the subject permits without the offending conditions;

C. An award of reasonable attorneys' fees for bringing and maintaining this action under 42 U.S.C. § 1988;

D. An award of costs of suit pursuant to Fed. R. Civ. P. 54(d); and

E. Any other relief that the Court deems just and proper under the circumstances.

DATED: July 31, 2025.

Respectfully submitted,

DAVID J. DEERSON
AUSTIN WAISANEN*

By *s/ David J. Deerson*
DAVID J. DEERSON

*Attorneys for Plaintiff*
**pro hac vice pending*